Thank you. And we're going to go on to case number five, and that case is 21-2858 and 21-3393. And it is Craftwood v. Generac Power Systems. And Mr. Luskin, there you are, hi. Morning, Your Honor. Hello. I think it's still morning, just by a few minutes. Anytime you're ready is fine. Sounds good, Your Honor, thank you. Scott Luskin for the appellants Craftwood II and Craftwood III. May it please the court. Neither Craftwood entity gave prior express permission to anyone to send fact ads. Express permission, as this court has found, requires that the consumer understand that by providing their fax number, he or she is agreeing to receive fax advertisements. This court has found that the permission must be affirmative and explicit, and that even evidence of permission generally to send faxes does not equate to permission to send fax advertisements. The do it best agreement. Is there anything in the record regarding for what purpose the plaintiffs thought they were providing a fax number at the end of the contract? There is, Your Honor. David Brun just testified that he was providing it for transactional purposes. They could send invoices back and forth or other things, which is exactly the type of thing that you would have in a transactional relationship providing a fax number. Indeed, the do it best agreement itself doesn't ask explicitly to send fax ads. There's no express permission. Even the district court below found that, and that should have been the end of the inquiry, but it didn't. Instead, the district court cobbled together express permission, in violation, I think, of this court's controlling standard in AS Medication, from the snippet advertising programs way at the beginning of the agreement, and then insertion of the fax number in the contact information section at the end. But even if that were somehow permission, that's not enough for Generac to win here, Your Honors. Generac needs to extend that permission to third parties, and there's no words in the agreement at all about vendors and faxers, affiliates, or third parties that would have permission, even if this cobbling together somehow worked. And Generac pointed to nothing either in its briefing. Indeed, if we have to even go beyond the words of the contract, and look at the extrinsic evidence here, to look at the meaning of advertising programs, Generac should already have lost. There's a wall of evidence that advertising programs is not anything related to fax advertising, and it's not anything related to third parties sending ads at all. No direct contact. Generac's last point was that the testimony of Sherry Davis supposedly could result in summary judgment. She said that she called Craftwood 2, and obtained prior express permission from that in 2012. But first, obviously we can't have an affirmance as to Craftwood 3. Davis admits that she never called them. Second, Davis's testimony is not credible, as I'll get into a little bit later. And it could be ignored at the summary judgment stage. But even beyond that, there was countervailing evidence that the trial court didn't give any weight to at all. There was testimony by David Brungess and Diana Newton, who runs Craftwood 2 and Craftwood 3, that they have a longstanding policy against giving permission to fax ads with no violations that they know about. They hate faxes. And that the call that Sherry Davis says she could have made could not be possible. Her testimony also was contradicted by her boss, Randall Allen, or former boss, I think now, Randall Allen, who was the president of the company in the 30 v. Six Witness, who testified that they didn't actually ask for permission. He had no record of it, and that they didn't need to, because they already thought that they could send fax ads once they got the phone number. Now- I mean, that seems like just a total credibility judgment. Who do you believe? I agree, Your Honor, and that's why- Well, we're gonna do that at summary judgment. So why on, why on, is it Craftwood 2? Correct. Right, that's who Davis works for, or that's Davis' testimony is relevant to. Why isn't that just a trial question? I agree, I think that is a trial question, Your Honor, and I was surprised that we ended up in this position that we end up in. It should have been quickly- I thought, no, no, no, okay, all right. I thought what you were saying earlier, I just may be mistaken. I thought what you were saying earlier is no, no, no, it's not a trial issue. You should just, we should win. We've never consented. Well, we've never consented, but we didn't file the motion for summary judgment, Your Honor, so I can't ask for you guys to give us the win right now. So your position on Craftwood 2 is it's given the Davis testimony, we got a trial issue. At best, we have a trial issue. I think you could ignore her testimony, but yes, we have a trial issue here, or at least we have an issue where we could affirmably see summary judgment later. So I think her testimony could probably be ignored, but likely it's a trial issue. Now, getting back to the agreement itself overall, there's no words in the agreement that come up to this concept of express permission that could be affirmative explicit. The crucial paragraph is not really anything related to faxes, advertising to the members at all. It says that do it best agrees to sell its goods and services and provide its advertising programs, training services and other programs to members, so long as a member timely pays for it at the corporation's established business prices, et cetera, for the sale and use by a member. What are you reading from? Paragraph one of the membership agreement? Yeah. Okay. And in this paragraph, we have several hallmarks that show that there's no permission for ads to members, let alone, again, ads that would get out to generate. Why would we need the words provide advertising programs as Diana Newton testified about? One of the advertising programs, and it's in the record as well, is to help members with advertising to their own customers. And even without that, just looking at the words of the agreement, you wouldn't need the word program if you were just gonna advertise directly to a member, you'd just say advertising. And you wouldn't say provide advertising programs, you'd just say we're gonna advertise to them. And then- Mr. Luskin, could I ask you about the 11th Circuit case law that Jeff Gettleman relied upon? In your view, do we need to split from the 11th Circuit in order to rule in your favor, or do we need to just stick with what we said in Physician's HealthSource against, you named it by AS Medication Solutions. Yes, so I used AS Medication, there's a bunch of Physician's HealthSource cases. Sorry? There's a bunch of Physician's HealthSource cases, so that's why I used AS Medication. I think for us to win, you don't need to split with the 11th Circuit. In that case, they rely upon the concept of providing optional assistance to purchase goods and services by the franchisor as well as their affiliates. Here, there's no affiliates. There's no discussion of a vendor, a manufacturer, a supplier, anyone that would cover Generac. I do think that the 11th Circuit, however, is wrong. They, there's really no express permission from that snippet as well, providing optional assistance for purchasing goods and services. And the distinction that the 11th Circuit seems to make from this circuit is, in the 11th Circuit opinion, it says, permission does not require that a recipient state specifically that his permission includes faxed debts. Whereas AS Medication says that a recipient must specifically acknowledge that faxed ads will follow from providing the phone number. So the 11th Circuit, you know, we don't need it, but at the same time, I don't think they're quite following what you guys were doing in AS Medication. Yes, Judge, I was wrong. Oh, okay. And your overarching point, I think, to correct me if I'm wrong, is regardless of all of that, how the agreement on receiving a fax comes out, they never conferred the express permission upon the sender here. Correct. That's right, Your Honor. So there's no question that Generac here is discussed at all in the agreement. There's no vendor, there's no manufacturer, as I've already said. So it shouldn't extend anywhere out to anyone like that. It would be really hard for anyone to say, look, okay, now everybody that, you know, the Generac has tried to say, well, anybody that provides goods gets to send it. But there's no discussion of that in the document, number one. And number two, then you'd have someone like Craftwood who stocks 10,000 goods, having to try and say to every single supplier, no, I don't want your faxes. They don't have any direct communication with these folks when they're signing up to be Do It Best members. They're just dealing with Do It Best. And even the Do It Best contract in paragraph eight says that the relationship is personal between the member and the corporation. The corporation, of course, is defined only as Do It Best. There's no discussion of affiliates or anybody else. Now, in addition to- Can you wrap this part up, I think? Yep, Your Honor. I think as to the, anything else on this front, you know, the Sherry Davis testimony, you know, I still think can be rejected here, but at the same time, as Judge Scudder said, you know, at worst, it's a tribal issue. As to the evidence on the contract interpretation piece for advertising programs, there's testimony from David Brunges, there's emails from Do It Best, there's all the documents that Do It Best provided showing that there is no direct contact by any vendors and that there's no fax advertising program at all for Do It Best or anyone else. With that, I will wait for any other questions on the floor. Thank you, Your Honor. Thank you. Okay, Mr. Resses. Thank you, good afternoon, and may it please the court, counsel. My name is Michael Resses, and I'm here today on behalf of Defendant Appellee, Generic Power Systems. The membership agreement cannot be interpreted in a vacuum. Plaintiffs miss the whole point of joining a buyer's co-op like Do It Best. The benefit, as Plaintiff's President, David Brunges, readily acknowledged under oath, is that the co-op can buy goods on better terms than plaintiffs, a small family-owned chain, can through its own purchasing power. That's the economic case for joining a co-op. The I.B. buys the goods. You certainly, in the briefs, seem to be glossing over the difference between advertising to customers of members versus advertising to T.I.B. members themselves. If I'm signing up to be part of a buying co-operative, I can imagine that I might be buying into a program that helps me advertise to customers. Isn't that what the agreement meant when it said that T.I.B. would be providing advertising programs? Well, Your Honor, I'm advocating for a practical construction of the term advertising programs. It's in the plural, not the singular. I disagree with counsel. You're advocating for why it might have been a good idea for Do It Best to seek and obtain express permission for receiving fax ads from all these vendors, but it's very hard for me to actually see that in the document. Well, Your Honor, I don't believe that, if you were to look at the term in context, advertising programs in paragraph one, the first line, immediately follows the undertaking by the co-op to sell its goods. T.I.B. is the seller here, not Generac. We're selling to the co-op, and the co-op, in turn, is selling to the plaintiffs, and advertising, all advertising, all advertising is about driving sales. Generac wants to sell more. The co-op wants to sell more. Plaintiffs, I believe, want to sell more. Is that how this statutory scheme works, though? I mean, what's your, I actually think you could be right on the commercial, kind of the commercial reality of this, but what I can't get to is, how are you right as a statutory matter? To me, it's an artificial distinction, to draw a distinction between the advertising that relates to products that are from a T.I.B., a do-it-best-approved vendor, and advertising that is, say, oriented towards the end consumer. There's nothing- But can you put any specific language in the agreement that gives permission to affiliates or other entities associated with T.I.B. to send taxes? Well, Your Honor, I do believe that, you know, there are cases that I've recognized that a single entity, such as the co-op here, do-it-best, can obtain consent for a group of persons or entities, such as the T.I.B.-approved vendors, to fax advertisements that would be, that would relate to the single entity. That can be done. The question here is, has it been done? Yeah, but can you point to any specific language in the agreement? That's my question. Well, Your Honor, I think that you have to read in context. I have to rely on the wording of the paragraph relating to advertising programs. Just because it's broad doesn't mean it's vague. And that's the point I think- Are there any limits? I'm sorry? Are there any limits on your theory that affiliates and suppliers- Well, I mean- T.I.B. has permission to send proof if T.I.B. has that permission? Well, I think you have to look at what the business model is here of a co-op. The goods are being purchased by the co-op because it has the economic power to negotiate the best prices for its members. Now, in turn, the co-op is going to have different programs to advertise for or intuitively. It can be business members. It can be advertising of the product, which is what two of the ads here were all about, Generac generators or products. There was a third, I'm sorry. Go ahead, I'm sorry. There was a third that related to a warranty for a Generac product that presumably  I don't believe that the law allows those fine distinctions. That's all I'm saying. Well, I think what you're saying is that any company that provides products to T.I.B. can send an unlimited number of faxes to any member of the co-operative as many times as it wishes to do so. If they want, okay, they can always opt out, but I would argue this. Remember, if you look at the Gorse Motel line of cases, and it's not just the 11th Circuit, it's also the Second Circuit, and it's also this circuit, which in Brigadoon back in March approved of those 11th and Second Circuit decisions. There wasn't any mention of advertising at all. It was, quote, optional assistance. And the courts- What there is mention of is Wyndham and its affiliates. That's right. Right, and that's what's missing here. Well, I take it that you don't have reference to affiliates or T.I.B. approved vendors. Right. Right. I get that, but I believe that the phrase- So permission hasn't been conferred. I know what you're gonna, we have to agree. Permission has not been conferred upon the sender, correct? Well, Your Honor, that depends on who the sender is, okay? Well, Do It Best didn't send it, right? Well, the sender is defined as the person or entity on whose behalf a faxed ad is sent or whose goods or services are being promoted. They're T.I.B.'s goods. They get them, Generac sells them to T.I.B., T.I.B. is then selling them to the member owners. The, I'm sorry, the T.I.B. is billing the member owners for the goods. So, and in the Gorse Motel cases, of course, they're not even really addressing the question of who the sender is. All they have to decide is whether or not, the real question is whether or not there was prior express permission and whether the ads were in the scope of the consent that was given. And here, based on, I think, what are the, the undisputed relationship between the parties, the craftwood entities were giving permission to the co-op to provide its advertising programs and those programs clearly include ads from T.I.B. preferred manufacturers or vendors. And I think that the relationship cannot be ignored. The phrase advertising programs in reference to paragraph one has to be placed in its proper factual context and where it appears in the agreement. Mr. Reeses, can I ask you about something in your brief? Yes. In page 10 of your brief, last sentence says, Davis requested craftwood twos, quote, fax number to send it promotions, close quote, generally and on an ongoing basis. What's the source for saying that was generally and on an ongoing basis? Your honor, I would have to, I would have to, I think that the reference to 253 is the statement of undisputed facts, it's paragraph 46 and it's citing, I know it's citing. I know what it's citing, I don't see this, I don't see that language or that content. Well, I can only say that I would have to go back and look at it and. Well, the plaintiffs state that they never gave such permission and so I don't know how this is an issue with Wayne Caterpillar. But I would say, I'm sorry. No, you go ahead. I was just gonna say that, you know, we're referring there to a testimony by Sherry Davis and that goes to a separate point relating to, if we are not talking about the membership agreement, but if now we're talking about whether craftwood two gave permission. I understand, but the assertion that that was permission put aside all the issues presented by her testimony, the assertion that she testified that it was, she was seeking permission generally and on an ongoing basis is very difficult to derive from that evidence. I will have to go back and look at that. Thank you. Well, we will stand on our other arguments in our brief. We thank you for your time this morning. We will do what we ask you to do. Thank you. We thank you. Thank you, Mr. Rees. Mr. Luskin, you have two minutes or three minutes, let's see, three. Great, thank you, your honors. I think a couple of points need to be made here and I think your honors have picked up on a lot of them. First, there is no language in the agreement giving express permission to do it best or anyone else. And they could have easily done it, right? Just like the FCC in this coordinated medication said, a clear statement indicating that by providing a fax number, the consumer agrees to receive vaccine advertisements. They could have just put it in there and then we'd easy peasy have it. There's nothing like that. Merely advertising programs, which I think is Judge Roper picked up on is really for help for the co-op member to advertise to its customers. And in fact, Diana Newton provided evidence of that and there's evidence of that from the do it best documents. Now, Generac wants to claim that this falls within this giant scope of the party's relationship, but I don't believe that's correct. Generac itself provided these vendor participation forms, none of which include the ability to send fax ads. They can get included in a merch book or an e-commerce type thing, where do it best is sending something to the members, but not Generac. And at the same time, why would do it best let Generac do that for free, send faxes for free when it's charging for everything else? It really just makes no sense. So there's sort of overarchingly ignoring both the contract and then the evidence itself. I think as it's a little different, the Brigadoon ruling I wanted to address real quick. I don't think that the court here actually made any determination that this type of defense worked. It said it was plausible, that there was a plausible defense in a franchise agreement, but didn't rule on it. Now, it turns out that the district court in that case actually ruled summary judgment in favor of the plaintiff, that there was no permission from the agreements that were there. And I think today was the first time I've now heard that do it best is somehow the sender of these faxes. I don't believe it is. Generac hired CMI to send faxes. They are Generac's goods and services that are being advertised there. So to the extent that they're arguing that, I think they've waived it anyway. And I think Judge Hamilton, you picked up on something correctly. I don't see anything in the testimony about generally an ongoing basis. Ms. Davis didn't remember anything about the calls other than getting the phone numbers. And basically that was sort of where she left. And the quote unquote fax list or permission list that she got, it doesn't say that. It's called the Lutron list with revisions or something of that nature. There's no discussion about permission. There's no explanation of when they used it or didn't use it. It just popped out of the blue well after her boss again, Randall Allen, had already testified that they didn't ask anybody for permission because they thought as long as I had a phone number, I could send a fax. And that's sort of the point of how the statutory scheme is set up. You need to get this express permission that this Cortinez medication is requested. It's a high bar because you want permission because there is a different bar for the CFR for EBR. I apologize, Your Honor. My time is up. No, you have to apologize. We thank you. Thank you, Your Honor. And we thank both of you very much. And we will take the case under advice.